RECEIVED
FEB 10 2012
LEONARD GREEN, Clerk

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| SIERRA CLUB ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | PETITION FOR REVIEW |
| ) | |
| UNITED STATES ENVIRONMENTAL ) | |
| PROTECTION AGENCY, and ) | |
| ) | Docket No. 12-3169 |
| LISA P. JACKSON, ) | |
| Administrator, United States ) | |
| Environmental Protection Agency, ) | |
| ) | |
| Respondents. ) | |

Pursuant to the Clean Air Act § 307(b)(1), 42 U.S.C. §7607(b)(1), Sierra Club hereby petitions the Court for review of the final action taken by respondents United States Environmental Protection Agency ("EPA") and its Administrator, Lisa P. Jackson ("the Administrator"), entitled "Approval and Promulgation of Implementation Plans and Designation of Areas for Air Quality Planning Purposes; Kentucky; Redesignation of the Kentucky Portion of the Cincinnati- Hamilton, OH-KY-IN 1997 Annual Fine Particulate Matter Nonattainment Area to Attainment." EPA assigned this action Docket number EPA-R04-OAR-2010-0937.

The final action was dated December 7, 2011, and notice was published in the Federal Register on December 15, 2011. 76 Fed. Reg. 77,903 (Dec. 15, 2011). The decision negatively impacts Sierra Club's members because it results in more air pollution being emitted into the air breathed by Sierra Club members than allowed by

1

law, and because it results in deficient monitoring and reporting of air pollution—information that Sierra Club and its members use to inform themselves of pollution.

This Court has jurisdiction to review the Administrator's final action pursuant to 42 U.S.C. § 7607(b)(1). It has been fewer than 60 days since notice of Respondents' final action appeared in the Federal Register. 76 Fed. Reg. at 77,908 ("Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by February 13, 2012."). Venue is proper in this Court because this is a challenge to a final action that is locally applicable to Kentucky. 42 U.S.C. § 7607(b)(1).

DATED: February 9, 2012

Respectfully submitted,

McGILLIVRAY WESTERBERG & BENDER LLC

David C. Bender

David C. Bender
Christa O. Westerberg
211 S. Paterson Street, Suite 320
Madison, WI 53703
Tel. 608.310.3560
Fax 608.310.3561
Email: bender@mwbattorneys.com
         westerberg@mwbattorneys.com

Attorneys for Petitioner Sierra Club

## CERTIFICATE OF SERVICE

On February 9, 2012, I caused to be served upon the following persons the foregoing Petition for Review by Certified United States Mail, Return Receipt Requested:

> Lisa P. Jackson
> United States Environmental Protection Agency
> Ariel Rios Building
> 1200 Pennsylvania Avenue, N.W.
> Washington, DC 20460

David C. Bender

Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

**Energy Effects**

We have analyzed this rule under Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use. We have determined that it is not a "significant energy action" under that Order because it is not a "significant regulatory action" under Executive Order 12866 and is not likely to have a significant adverse effect on the supply, distribution, or use of energy. The Administrator of the Office of Information and Regulatory Affairs has not designated it as a significant energy action. Therefore, it does not require a Statement of Energy Effects under Executive Order 13211.

**Technical Standards**

The National Technology Transfer and Advancement Act (NTTAA) (15 U.S.C. 272 note) directs agencies to use voluntary consensus standards in their regulatory activities unless the agency provides Congress, through the Office of Management and Budget, with an explanation of why using these standards would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (e.g., specifications of materials, performance, design, or operation; test methods; sampling procedures; and related management systems practices) that are developed or adopted by voluntary consensus standards bodies. This rule does not use technical standards. Therefore, we did not consider the use of voluntary consensus standards.

**Environment**

We have analyzed this rule under Commandant Instruction M16475.1D, which guides the Coast Guard in complying with the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321–4370f), and have concluded that there are no factors in this case that would limit the use of a categorical exclusion under section 2.B.2 of the Instruction. Therefore, this rule is categorically excluded, under figure 2–1, paragraph (34)(g), of the Instruction. This rule establishes a temporary safety zone.

An environmental analysis checklist and a categorical exclusion determination are required for this rule, and will be provided as indicated in the **ADDRESSES** Section.

**List of Subjects in 33 CFR Part 165**

Harbors, Marine safety, Navigation (water), Reporting and recordkeeping requirements, Security measures, Waterways.

For the reasons discussed in the preamble, the Coast Guard amends 33 CFR Part 165 as follows:

**PART 165—REGULATED NAVIGATION AREAS AND LIMITED ACCESS AREAS**

■ 1. The authority citation for part 165 continues to read as follows:

**Authority:** 33 U.S.C. 1231; 46 U.S.C. Chapter 701, 3306, 3703; 50 U.S.C. 191, 195; 33 CFR 1.05–1, 6.04–1, 6.04–6, and 160.5; Pub. L. 107–295, 116 Stat. 2064; Department of Homeland Security Delegation No. 0170.1.

■ 2. A new temporary § 165.T08–1087 is added to read as follows:

**§ 165.T08–1087 Safety Zone; Upper Mississippi River, Mile 389.4 to 403.1.**

(a) *Location.* The following area is a safety zone: All waters of the Upper Mississippi River, Mile 389.4 to 403.1, extending the entire width of the waterway and located on the Iowa and Illinois border.

(b) *Effective date.* This rule is effective from 7 a.m. on November 22, 2011 through 7 p.m. CST on December 21, 2011.

(c) *Periods of Enforcement.* This rule will be enforced during bridge span operations scheduled for 7 a.m. through 12:00 noon CST on November 22, 2011. Additional bridge span operations occur within the period from November 22, 2011 through December 21, 2011. The Captain of the Port Upper Mississippi River will inform the public of the enforcement periods, planned dates of bridge span operations and any safety zone changes through broadcast notice to mariners.

(d) *Regulations.* (1) In accordance with the general regulations in § 165.23 of this part, entry into this zone is prohibited unless authorized by the Captain of the Port Upper Mississippi River or a designated representative.

(2) Persons or vessels requiring entry into or passage through the zone must request permission from the Captain of the Port Upper Mississippi River or a designated representative. The Captain of the Port Upper Mississippi River representative may be contacted at (314) 269–2332.

(3) All persons and vessels shall comply with the instructions of the Captain of the Port Upper Mississippi River or their designated representative. Designated Captain of the Port representatives include United States Coast Guard commissioned, warrant, and petty officers.

Dated: November 22, 2011.
**B.L. Black,**
*Captain, U.S. Coast Guard, Captain of the Port Upper Mississippi River.*
[FR Doc. 2011–32137 Filed 12–14–11; 8:45 am]
**BILLING CODE 9110–04–P**

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 52 and 81**

[EPA–R04–OAR–2010–0937–201164; FRL–9506–3]

**Approval and Promulgation of Implementation Plans and Designation of Areas for Air Quality Planning Purposes; Kentucky; Redesignation of the Kentucky Portion of the Cincinnati-Hamilton, OH-KY-IN 1997 Annual Fine Particulate Matter Nonattainment Area to Attainment**

**AGENCY:** Environmental Protection Agency (EPA).
**ACTION:** Final rule.

**SUMMARY:** EPA is taking final action to approve a request submitted on January 27, 2011, from the Commonwealth of Kentucky, through the Kentucky Energy and Environment Cabinet, Division for Air Quality (DAQ), to redesignate the Kentucky portion of the Cincinnati-Hamilton, Ohio-Kentucky-Indiana (hereafter referred to as the "Tri-state Cincinnati-Hamilton Area") fine particulate matter ($PM_{2.5}$) nonattainment area to attainment for the 1997 Annual $PM_{2.5}$ National Ambient Air Quality Standards (NAAQS). The Tri-state Cincinnati-Hamilton Area is comprised of Boone, Campbell, and Kenton Counties in Kentucky (hereafter referred to as the "Northern Kentucky Area" or "Area"); Butler, Clermont, Hamilton, and Warren Counties in Ohio; and a portion of Dearborn County in Indiana. EPA's approval of the redesignation request is based on the determination that Kentucky has met the criteria for redesignation to attainment set forth in the Clean Air Act (CAA or Act). Additionally, EPA is approving a revision to the Kentucky State Implementation Plan (SIP) to include the 1997 Annual $PM_{2.5}$ maintenance plan for the Northern Kentucky Area that contains the new 2015 and 2021 motor vehicle emission budgets (MVEBs) for nitrogen oxides ($NO_X$) and $PM_{2.5}$ for that Area. On December 9, 2010, and January 25, 2011, respectively, Ohio and Indiana submitted requests to redesignate their portion of the Tri-state Cincinnati-Hamilton Area to attainment for the 1997 $PM_{2.5}$ NAAQS. EPA is taking

action on the requests from Ohio and Indiana in an action separate from this final action. This action also approves the emissions inventory submitted with the maintenance plan. Additionally, EPA is responding to comments received on EPA's October 21, 2011, proposed rulemaking.

**DATES:** *Effective Date:* This rule will be effective December 15, 2011.

**ADDRESSES:** EPA has established a docket for this action under Docket Identification No. EPA-R04-OAR-2010-0937. All documents in the docket are listed on the *www.regulations.gov* Web site. Although listed in the index, some information is not publicly available, *i.e.*, Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *http://www.regulations.gov* or in hard copy at the Regulatory Development Section, Air Planning Branch, Air, Pesticides and Toxics Management Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW., Atlanta, Georgia 30303-8960. EPA requests that if at all possible, you contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section to schedule your inspection. The Regional Office's official hours of business are Monday through Friday, 8:30 to 4:30, excluding Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Madolyn Dominy or Joel Huey, Regulatory Development Section, Air Planning Branch, Air, Pesticides and Toxics Management Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW., Atlanta, Georgia 30303-8960. Madolyn Dominy may be reached by phone at (404) 562-9644 or via electronic mail at *dominy.madolyn@epa.gov.* Joel Huey may be reached by phone at (404) 562-9104 or via electronic mail at *huey.joel@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. What is the background for the actions?
II. What are the actions EPA is taking?
III. What is EPA's response to comments?
IV. Why is EPA taking these actions?
V. What are the effects of these actions?
VI. Final Action
VII. Statutory and Executive Order Reviews

**I. What is the background for the actions?**

On January 27, 2011, Kentucky, through DAQ, submitted a request to redesignate the Northern Kentucky Area to attainment for the 1997 Annual $PM_{2.5}$ NAAQS and for EPA approval of the Kentucky SIP revision containing a maintenance plan for the Area. In an action published on October 21, 2011 (76 FR 65458), EPA proposed approval of Kentucky's plan for maintaining the 1997 Annual $PM_{2.5}$ NAAQS, including the emissions inventory submitted pursuant to CAA section 172(c)(3); and the $NO_X$ and $PM_{2.5}$ MVEBs for the Northern Kentucky Area as contained in the maintenance plan. At that time, EPA also proposed to approve the redesignation of the Northern Kentucky Area to attainment.[1] Additional background for today's action is set forth in EPA's October 21, 2011, proposal.

The MVEBs, specified in tons per year (tpy), included in the maintenance plan are as follows:

TABLE 1—NORTHERN KENTUCKY AREA MVEBS

[tpy]

|  | $PM_{2.5}$ | $NO_X$ |
|---|---|---|
| 2015 Mobile Emissions | 371.11 | 6,996.22 |
| 2015 Safety Margin Allocation | 18.56 | 1,049.43 |
| 2015 Total Mobile Budget | 389.67 | 8,045.65 |
| 2021 Mobile Emissions | 275.38 | 6,421.15 |
| 2021 Safety Margin Allocation | 27.54 | 963.17 |
| 2021 Total Mobile Budget | 302.92 | 7,384.32 |

In its October 21, 2011, proposed action, EPA noted that the adequacy public comment period on these MVEBs (as contained in Kentucky's submittal) began on February 14, 2011, and closed on March 16, 2011. No comments were received during the public comment period. In today's action, EPA is concluding the adequacy process by finding the new MVEBs for the Northern Kentucky Area adequate for the purposes of transportation conformity.

As stated in the October 21, 2011, proposal, this redesignation addresses the Northern Kentucky Area's status solely with respect to the 1997 Annual $PM_{2.5}$ NAAQS, for which designations were finalized on January 5, 2005 (70 FR 944), and as supplemented on April 14, 2005 (70 FR 19844).

EPA reviewed $PM_{2.5}$ monitoring data from ambient $PM_{2.5}$ monitoring stations in the Cincinnati-Hamilton Area from 2007-2010. These data have been quality-assured and are recorded in Air Quality System (AQS). The annual arithmetic mean $PM_{2.5}$ concentrations for 2007-2010 and the 3-year averages of these values (*i.e.,* design values) for 2007-2009 and 2008-2010 are summarized in Table 2. The design values demonstrate that the Northern Kentucky Area (as part of the Cincinnati-Hamilton Area) continues to meet the $PM_{2.5}$ NAAQS and that the ambient concentrations of $PM_{2.5}$ are continuing to decrease in the Area. EPA has also reviewed preliminary monitoring data for 2011, which indicate that the Cincinnati-Hamilton Area continues to attain the 1997 $PM_{2.5}$ NAAQS. These preliminary data are available in the Docket for today's action although it is not yet certified.

---

[1] On September 29, 2011, at 76 FR 60373, EPA determined that the Tri-state Cincinnati-Hamilton Area attained the 1997 $PM_{2.5}$ NAAQS by its applicable attainment date of April 5, 2010, and that the Area was continuing to attain the $PM_{2.5}$ standard with monitoring data that was currently available.

TABLE 2—DESIGN VALUE CONCENTRATIONS FOR THE TRI-STATE CINCINNATI-HAMILTON AREA FOR THE 1997 ANNUAL PM$_{2.5}$ NAAQS (µg/m$^3$)

| Location | County | Monitor ID | Annual mean concentrations | | | | 3-Year design values | |
|---|---|---|---|---|---|---|---|---|
| | | | 2007 | 2008 | 2009 | 2010 | 2007–2009 | 2008–2010 |
| John Hill | Campbell, KY | 21–037–3002 | 14.36 | 11.83 | 11.34 | 11.8 | 12.3 | 11.6 |
| Dixie | Kenton, KY | 21–117–0007 | 14.20 | 11.99 | 11.04 | *12.1 | 12.4 | 11.5 |
| Bonita & St John | Butler, OH | 39–017–0003 | 15.40 | 13.80 | 12.83 | 13.6 | 13.9 | 13.4 |
| Nilles | Butler, OH | 39–017–0016 | 14.94 | 13.75 | 13.08 | 13.5 | 13.8 | 13.4 |
| Hook Field | Butler, OH | 39–017–1004 | 14.62 | n/a | n/a | n/a | 14.6 | n/a |
| Clermont Center | Clermont, OH | 39–025–0022 | 14.01 | 11.75 | 11.01 | 12.0 | 12.2 | 11.6 |
| Grooms | Hamilton, OH | 39–061–0006 | 14.63 | 12.48 | 12.11 | *12.7 | 13.1 | 12.4 |
| Seymour & Vine | Hamilton, OH | 39–061–0014 | 16.59 | 15.06 | 13.38 | 14.8 | 15.0 | 14.4 |
| WM. Howard Taft | Hamilton, OH | 39–061–0040 | 15.09 | 12.62 | 12.73 | 13.3 | 13.4 | 12.9 |
| W. 8th | Hamilton, OH | 36–061–0042 | 15.90 | 14.40 | 13.71 | 14.5 | 14.6 | 14.2 |
| E. Kemper | Hamilton, OH | 36–061–0043 | 14.85 | 13.32 | n/a | n/a | 14.1 | n/a |
| Sherman | Hamilton, OH | 39–061–7001 | 15.09 | 13.74 | 12.97 | 14.1 | 14.0 | 13.6 |
| Murray | Hamilton, OH | 39–016–8001 | 16.07 | 14.40 | 13.40 | *17.6 | 14.6 | n/a |
| Southeast | Warren, OH | 39–165–0007 | 13.98 | 11.92 | 11.70 | 11.9 | 12.4 | 11.8 |

*Design value does not meet data completeness requirements due to closure or start-up of the monitoring stations.

## II. What are the actions EPA is taking?

In today's rulemaking, EPA is approving: (1) Kentucky's emissions inventory, which was submitted pursuant to CAA section 172(c)(3); (2) Kentucky's 1997 Annual PM$_{2.5}$ maintenance plan (such approval being one of the CAA criteria for redesignation to attainment status) for the Northern Kentucky Area, including MVEBs; and, (3) Kentucky's redesignation request to change the legal designation of Boone, Campbell and Kenton Counties in their entireties from nonattainment to attainment for the 1997 Annual PM$_{2.5}$ NAAQS. The maintenance plan is designed to demonstrate that the Northern Kentucky Area will continue to attain the 1997 Annual PM$_{2.5}$ NAAQS through 2021. EPA's approval of the redesignation request is based on EPA's determination that the Northern Kentucky Area meets the criteria for redesignation set forth in CAA, sections 107(d)(3)(E) and 175A, including EPA's determination that the Northern Kentucky Area has attained the 1997 Annual PM$_{2.5}$ NAAQS. EPA's analyses of Kentucky's redesignation request, emissions inventory, and maintenance plan are described in detail in the October 21, 2011, proposed rule (76 FR 65458).

Consistent with the CAA, the maintenance plan that EPA is approving also includes 2015 and 2021 MVEBs for NO$_X$ and PM$_{2.5}$ for the Northern Kentucky Area. In this action, EPA is approving these NO$_X$ and PM$_{2.5}$ MVEBs for the purposes of transportation conformity. For required regional emissions analysis years involving 2015 and prior to 2021, the applicable budgets will be the new 2015 MVEBs. For required regional emissions analysis years that involve 2021 or beyond, the applicable budgets will be the new 2021 MVEBs.

## III. What is EPA's response to comments?

EPA received one set of comments on the October 21, 2011, proposed actions associated with the redesignation of the Northern Kentucky Area for the 1997 Annual PM$_{2.5}$ NAAQS. A summary of the comments and EPA's responses are provided below.

*Comment 1:* The Commenter states "EPA has failed to conduct an adequate analysis under Clean Air Act Section 110(l) on what effect redesignation will have on the 2006 24 hour PM$_{2.5}$ NAAQS, the 1-hour NO$_X$ NAAQS, the 1-hour SO$_2$ [sulfur dioxide] NAAQS and the 2008 75 parts per billion ozone NAAQS."

*Response 1:* Section 110(l) provides in part: "[t]he Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress * * *, or any other applicable requirement of this chapter." EPA disagrees with the Commenter's assertion that EPA did not consider 110(l) in terms of the October 21, 2011, proposed action. As a general matter, EPA must and does consider section 110(l) requirements with action on each SIP revision, although EPA does not interpret section 110(l) as requiring a full attainment demonstration for every SIP revision. *See, e.g.,* 70 FR 53, 57 (January 3, 2005); 70 FR 17029, 17033 (April 4, 2005); 70 FR 28429, 28431 (May 18, 2005); and 70 FR 58119, 58134 (October 5, 2005). However, the redesignation does not relax any existing control requirements, nor does it alter any existing control requirements. On that basis, EPA concludes that this redesignation will not interfere with attainment or maintenance of any of these air quality standards. The Commenter does not provide any information in its comment to indicate that approval of Kentucky's redesignation would have any impact on the Area's ability to comply with on the 2006 24-hour PM$_{2.5}$ NAAQS, the 1-hour NO$_X$ NAAQS, the 1-hour SO$_2$ NAAQS or the 2008 75 parts per billion ozone NAAQS. Kentucky's January 27, 2011, redesignation request and maintenance plan for the 1997 annual PM$_{2.5}$ NAAQS does not revise or remove any existing emissions limit for any NAAQS, or any other existing substantive SIP provisions. In fact, the maintenance plan provided with the Commonwealth's submission demonstrates a decline in the direct PM$_{2.5}$ and PM$_{2.5}$ precursor (*e.g.*, NO$_X$ and SO$_2$) emissions over the timeframe of the initial maintenance period.[2] For these reasons, EPA disagrees that the Commenter has identified a rationale on which EPA could disapprove of the SIP revision at issue.

*Comment 2:* The Commenter states that "EPA has not established that any of the emission reductions did not come from the NO$_X$ SIP Call, CAIR [Clean Air Interstate Rule] and CSAPR [Cross State Air Pollution Rule]. Emission

---

[2] EPA notes that the Cincinnati/Northern Kentucky Area does not have violating monitors for the 2006 24-hour PM$_{2.5}$ NAAQS, the 1-hour NO$_X$ NAAQS, or the 1-hour SO$_2$ NAAQS, and that this Area has never been designated nonattainment for 2006 24-hour PM$_{2.5}$ NAAQS, the 1-hour NO$_X$ NAAQS, or the 1-hour SO$_2$ NAAQS.

reductions pursuant to these programs are not permanent and enforceable because these programs are cap and trade programs. Any source which reduced its actual emissions pursuant to one of these trading programs could at any time in the future choose to increase their emissions by purchasing emission credits." The Commenter further opines that "[t]his problem is worsened by EPA's recent proposal to all[ow] increased trading under CSAPR until 2014."

*Response 2:* Contrary to the Commenter's statement, EPA did establish in the proposal notice that at least part of the emission reductions that helped the area achieve attainment came from programs other than the $NO_X$ SIP Call, CAIR and CSAPR. The notice lists several permanent and enforceable reductions in emissions resulting from implementation of the Kentucky SIP, applicable Federal air pollution control regulations, and other reductions that are not "cap and trade" programs. Those programs include Tier 2 vehicle standards, heavy-duty gasoline and diesel highway vehicle standards, nonroad spark-ignition engines and recreational engines standards, large nonroad diesel engine standards, open burning bans, and fugitive emissions standards. *See* 76 FR 65465.

Further, EPA disagrees with the Commenter's conclusion that emission reductions associated with trading programs such as the $NO_X$ SIP Call, CAIR, and CSAPR are not permanent and enforceable simply because the underlying program is an emissions trading program. The Commenter appears to be arguing that these reductions cannot be considered permanent and enforceable within the meaning of section 107(d)(3)(E)(iii) of the CAA. Section 107(d)(3)(E)(iii) requires that, in order to redesignate an area to attainment, the Administrator must determine that "the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable SIP and applicable federal air pollutant control regulations and other permanent and enforceable reductions." EPA disagrees with the Commenter's conclusion that reductions from trading programs cannot be considered permanent and enforceable because these programs allow individual sources to choose between purchasing emission credits and reducing emissions.

The final CSAPR allows sources to trade allowances with other sources in the same or different states while firmly constraining any emissions shifting that may occur by requiring a strict emission ceiling in each state (the budget plus variability limit). As explained in EPA's proposed redesignation notice for the Northern Kentucky Area, the emission reduction requirements of CAIR are enforceable through the 2011 control period, and because CSAPR has now been promulgated to address the requirements previously addressed by CAIR and gets similar or greater reductions in the relevant areas in 2012 and beyond, EPA considers the emission reductions that led to attainment in the Northern Kentucky Area to be permanent and enforceable. The emission ceilings within each state are a permanent requirement of the CSAPR and are made enforceable through the associated Federal Implementation Plans.

EPA responded to a similar comment in its "Approval and Promulgation of Air Quality Implementation Plans; Redesignation of the Evansville area to attainment of the Fine Particulate Matter Standard." 76 FR 59527, 59529, September 27, 2011. In that notice, EPA discusses several factors which support EPA's determination that the $SO_2$ reductions in the Evansville area are permanent and enforceable and which also apply to the Northern Kentucky Area. First, given the mandates under CSAPR, any utility that has already spent the hundreds of millions of dollars to install scrubbers will find continued effective operation of those controls to be far more cost-effective than disregarding this investment and either expending similar capital installing replacement scrubbers elsewhere or purchasing credits at a price equivalent to that capital already spent. In short, any utility in a state covered by CSAPR provisions related to $PM_{2.5}$ that has installed scrubbers is almost certain under CSAPR to retain the scrubbers and operate them effectively. Second, any action by a utility that increases its emissions, requiring the purchase of allowances, necessitates a corresponding reduction by the utility that sells the allowances. Given the regional nature of particulate matter, this corresponding emission reduction will have an air quality benefit that will compensate at least in part for the impact of any emission increase from utility companies outside Kentucky but near the Kentucky area. Third, in response to the opinion of the Court of Appeals for the District of Columbia Circuit, CSAPR includes assurance provisions to ensure that the necessary emission reductions occur within each covered state.

The recent proposed rule revision referenced by the Commenter would amend the CSAPR assurance penalty provisions for all states within the program so they start in 2014 instead of 2012. 76 FR 63860 (October 14, 2011). As explained in the proposal, which was subject to public review and comment, this revision would promote the development of allowance market liquidity, thereby smoothing the transition from the CAIR programs to the CSAPR programs in 2012. As further explained in the proposal, the proposed revisions:

Would not affect, in any way, the requirements of the rule in 2014 and beyond. EPA is proposing only a short postponement of the assurance penalty provisions to ensure a smooth transition from CAIR to the Transport Rule programs. EPA believes that, notwithstanding postponement of the assurance penalty provisions, the states covered by the Transport Rule programs will still achieve the emission reductions in 2012 and 2013 necessary to eliminate each state's significant contribution to nonattainment and interference with maintenance identified in the final Transport Rule (with the revisions included in this proposal). The highly detailed state-specific bases on which individual state budgets were determined using the approach and methodologies developed in the final Transport Rule, and included in the record for the Transport Rule, together with the derivation of the variability limits from historic data reflecting state-level year-to-year variation in power sector emissions, support EPA's belief. *See* 76 FR at 63871.

Further, Kentucky's maintenance plan provides for verification of continued attainment by performing future reviews of triennial emissions inventories and also for contingency measures to ensure that the NAAQS is maintained into the future if monitored increases in ambient $PM_{2.5}$ concentrations occur. *See* 76 FR 65469. For this and the above reasons, EPA disagrees that the Commenter has identified a basis on which EPA should disapprove this SIP revision.

*Comment 3:* The Commenter states that Kentucky does not have fully approved adequate SIPs due to what the Commenter characterizes as an "exemption" for excess emissions due to malfunction and shutdown in the discretion of the director. The Commenter cites to a number of different provisions to support the conclusion that Kentucky's regulations should be revised to "clearly comply" with the CAA and EPA guidance (citations also provided) such that all excess emissions are violations and to preserve the authority of EPA and citizens to enforce the SIP standards and limitations.

*Response 3:* The CAA sets forth the general criteria for redesignation of an area from nonattainment to attainment in Section 107(d)(3)(E). Specifically, that section identifies five main criteria

including that "the Administrator has fully approved the applicable implementation plan for the area under section 7410(k) of this title." 42 U.S.C. 7407(d)(3)(E)(ii). Although the Commenter does not specifically cite to section 107(d)(3)(E)(ii), the language used in the comment ("fully approved adequate SIP") appears to derive from this section of the CAA (and the Commenter does later cite to 107(d)(3)(E) in the concluding paragraph of the comment letter. As a preliminary matter, the issue before EPA in the current rulemaking action is a redesignation for the Kentucky portion of the Tri-state Cincinnati-Hamilton Area to attainment for the 1997 $PM_{2.5}$ standard, including the maintenance plan. The SIP provisions identified in the Commenter's letter are not currently being proposed for revision as part of the redesignation submittal. Thus, EPA's review here is limited to whether the already approved provisions affect any of the requirements for redesignation in a manner that would preclude EPA from approving the redesignation request. Because the rules cited by the Commenter are not pending before EPA and/or are not the subject of this rulemaking action, EPA did not undertake a full SIP review of the individual provisions. It has long been established that EPA may rely on prior SIP approvals in approving a redesignation request plus any additional measures it may approve in conjunction with a redesignation action. *See e.g.,* page 3 of the September 4, 1992, John Calcagni Memorandum; *Southwestern Pennsylvania Growth Alliance v. Browner,* 144 F.3d 984, 989–990 (6th Cir. 1998); *Wall v. EPA,* 265 F.3d 426 (6th Cir. 2001); 68 FR 25413, 25426 (May 12, 2003).

Additionally, in the comment the word "adequate" was inserted into the statement "fully approved SIP" (which is the language of Section 107(d)(3)(E)(ii)) such that the Commenter stated that Kentucky must have a "fully approved adequate SIP." The word "adequate" is not included in Section 107(d)(3)(E)(ii), and its inclusion alters the plain text of the CAA for that particular provision. Furthermore, while the Commenter opines that the eight cited-to provisions of the Kentucky rules result in a "regulatory structure that is inconsistent with the fundamental requirement that all excess emissions be considered violations," the Commenter does not link this concern with deficiencies in Kentucky's redesignation submittal for the Northern Kentucky Area. There is no information provided indicating that Kentucky has excused violations and that such actions result in Kentucky failing to meet a requirement for redesignation. Furthermore, there is no information provided indicating that even if Kentucky were to excuse such violations that the violations would not be actionable by EPA or citizens.

To the contrary, on November 4, 2011, Kentucky's Energy and Environment Cabinet, Department for Environmental Protection, Division for Air Quality, explained in a letter to EPA Region 4 that "The Division would like to make clear that no provision in 401 KAR 50:055 prohibits the Director from taking enforcement action for excess emissions resulting from startup, shutdown, and malfunction events." The letter further states that "EPA's enforcement authorities are established pursuant to Section 113 of the CAA, and a determination by the Director does not limit EPA's authority to take enforcement action. Similarly, Section 304 of the CAA provides enforcement authority requirements to citizens and is not limited by the Director's determination." EPA understands that the Commenter has other concerns; however, with regard to this issue on enforcement authorities, Kentucky's November 4, 2011, correspondence addresses the Commenter's apparent misconception.[3]

Notably, on June 30, 2011, Sierra Club filed a Petition to Find Inadequate and Correct Several State Implementation Plans under Section 110 of the Clean Air Act Due to Startup, Shutdown, Malfunction, and/or Maintenance Provisions. EPA has agreed to respond to this petition by August 31, 2012, as part of settlement of a lawsuit. *See Sierra Club et al. v. Jackson,* No. 3:10–cv–04060–CRB (N.D. Cal). The comments regarding start up, shut down and malfunctions submitted on this redesignation action are identical to the Kentucky-specific portion of the above-referenced Petition (at pages 39–40). EPA intends to review those provisions consistent with its review of the Petition. At this time, with regard to the redesignation of the Kentucky portion of the Tri-state Cincinnati-Hamilton Area, Kentucky has a fully approved SIP consistent with applicable requirements and EPA does not agree that the Commenter has raised a basis on which EPA could disapprove of the redesignation request at issue.

---

[3] Although EPA interprets the SIP as indicated by the Commonwealth in its letter, EPA recognizes that the citations identified by the commenter may not be as clear as would be ideal. EPA encourages the Commonwealth to clarify the language in any future revisions to these provisions of the SIP.

### IV. Why is EPA taking these actions?

EPA has determined that the Northern Kentucky Area (as part of the Tri-state Cincinnati-Hamilton Area) has attained the 1997 Annual $PM_{2.5}$ NAAQS and has also determined that all other criteria for the redesignation of the Northern Kentucky Area from nonattainment to attainment of the 1997 Annual $PM_{2.5}$ NAAQS have been met. *See* CAA section 107(d)(3)(E). One of those requirements is that the Northern Kentucky Area has an approved plan demonstrating maintenance of the 1997 Annual $PM_{2.5}$ NAAQS. EPA is also taking final action to approve the maintenance plan for the Northern Kentucky Area as meeting the requirements of sections 175A and 107(d)(3)(E) of the CAA. In addition, EPA is approving the emissions inventory as meeting the requirements of section 172(c)(3) of the CAA. Finally, EPA is approving the new $NO_X$ and $PM_{2.5}$ MVEBs for the years 2015 and 2021 as contained in Kentucky's maintenance plan for the Northern Kentucky Area because these MVEBs are consistent with maintenance of the 1997 Annual $PM_{2.5}$ standard in the Area. The detailed rationale for EPA's findings and actions are set forth in the proposed rulemaking and in other discussion in this final rulemaking.

### V. What are the effects of these actions?

Approval of the redesignation request changes the legal designation of Boone, Campbell and Kenton Counties in their entireties from nonattainment to attainment for the 1997 Annual $PM_{2.5}$ NAAQS. EPA is modifying the regulatory table in 40 CFR 81.318 to reflect a designation of attainment for these counties. EPA is also approving, as a revision to the Kentucky SIP, the Commonwealth's plan for maintaining the 1997 Annual $PM_{2.5}$ NAAQS in the Northern Kentucky Area through 2021. The maintenance plan includes contingency measures to remedy possible future violations of the 1997 Annual $PM_{2.5}$ NAAQS, and establishes $NO_X$ and $PM_{2.5}$ MVEBs for the years 2015 and 2021 for the Northern Kentucky Area. Additionally, this action approves the emissions inventory for the Northern Kentucky Area pursuant to section 172(c)(3) of the CAA.

### VI. Final Action

EPA is taking final action to approve the redesignation and change the legal designation of Boone, Campbell, and Kenton Counties in their entireties from nonattainment to attainment for the 1997 Annual $PM_{2.5}$ NAAQS. Through this action, EPA is also approving into

the Kentucky SIP the 1997 Annual $PM_{2.5}$ maintenance plan for the Northern Kentucky Area, which includes for this Area the new MVEBs of 8,045.65 tpy of $NO_X$ and 389.67 tpy of $PM_{2.5}$ for 2015 and 7,384.32 tpy of $NO_X$ and 302.92 tpy of $PM_{2.5}$ for 2021.

Additionally, EPA is approving the 2008 emissions inventory for the Northern Kentucky Area pursuant to section 172(c)(3) of the CAA. In today's action, EPA is concluding the adequacy process by finding the new MVEBs for the Northern Kentucky Area adequate for the purposes of transportation conformity. Within 24 months from the date of publication for this final action, the transportation partners are required to demonstrate conformity to the new $PM_{2.5}$ and $NO_X$ MVEBs pursuant to 40 CFR 93.104(e).

In accordance with 5 U.S.C. 553(d), EPA finds there is good cause for this action to become effective immediately upon publication. This is because a delayed effective date is unnecessary due to the nature of a redesignation to attainment, which relieves the Area from certain CAA requirements that would otherwise apply to it. The immediate effective date for this action is authorized under both 5 U.S.C. 553(d)(1), which provides that rulemaking actions may become effective less than 30 days after publication if the rule grants or recognizes an exemption or relieves a restriction, and section 553(d)(3), which allows an effective date less than 30 days after publication as otherwise provided by the agency for good cause found and published with the rule. The purpose of the 30-day waiting period prescribed in section 553(d) is to give affected parties a reasonable time to adjust their behavior and prepare before the final rule takes effect. Today's rule, however, does not create any new regulatory requirements such that affected parties would need time to prepare before the rule takes effect. Rather, today's rule relieves the Commonwealth of various requirements for the Northern Kentucky Area. For these reasons, EPA finds good cause under 5 U.S.C. 553(d)(3) for this action to become effective on the date of publication of this action.

## VII. Statutory and Executive Order Reviews

Under the CAA, redesignation of an area to attainment and the accompanying approval of the maintenance plan under CAA section 107(d)(3)(E) are actions that affect the status of a geographical area and do not impose any additional regulatory requirements on sources beyond those required by state law. A redesignation to attainment does not in and of itself impose any new requirements, but rather results in the application of requirements contained in the CAA for areas that have been redesignated to attainment. Moreover, the Administrator is required to approve a SIP submission that complies with the provisions of the Act and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA. Accordingly, this action merely approves state law as meeting Federal requirements and does not impose additional requirements beyond those imposed by state law. For these reasons, these actions:

• Are not a "significant regulatory action" subject to review by the Office of Management and Budget under Executive Order 12866 (58 FR 51735, October 4, 1993);

• Do not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);

• Are certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);

• Do not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);

• Do not have Federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);

• Are not an economically significant regulatory action based on health or safety risks subject to Executive Order 13045 (62 FR 19885, April 23, 1997);

• Are not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001);

• Are not subject to requirements of Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the CAA; and,

• Do not provide EPA with the discretionary authority to address, as appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

In addition, this final rule does not have tribal implications as specified by Executive Order 13175 (65 FR 67249, November 9, 2000), because the SIP is not approved to apply in Indian country located in the Commonwealth, and EPA notes that it will not impose substantial direct costs on tribal governments or preempt tribal law.

The Congressional Review Act, 5 U.S.C. 801 *et seq.*, as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this action and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by February 13, 2012. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. (*See* section 307(b)(2).)

## List of Subjects

### 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Reporting and recordkeeping requirements, and Particulate matter.

### 40 CFR Part 81

Environmental protection, Air pollution control, National parks.

Dated: December 7, 2011.

**Gwendolyn Keyes Fleming,**
*Regional Administrator, Region 4.*

40 CFR parts 52 and 81 are amended as follows:

## PART 52—[AMENDED]

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

### Subpart S—Kentucky

■ 2. Section 52.920(e) is amended by adding a new entry "1997 Annual $PM_{2.5}$

Maintenance Plan for the Northern Kentucky Area" at the end of the table to read as follows:

§ 52.920　Identification of plan.
\* \* \* \* \*
(e) \* \* \*

EPA-APPROVED KENTUCKY NON-REGULATORY PROVISIONS

| Name of non-regulatory SIP provision | Applicable geographic or nonattainment area | State submittal date/effective date | EPA approval date | Explanations |
|---|---|---|---|---|
| \* | \* | \* | \* | \* |
| 1997 Annual $PM_{2.5}$ Maintenance Plan for the Northern Kentucky Area. | Boone, Campbell and Kenton Counties (Kentucky portion of the Cincinnati-Hamilton OH-KY-IN Area). | 1/27/11 | 12/15/2011. [Insert citation of publication]. | For the 1997 Annual $PM_{2.5}$ NAAQS. |

PART 81—[AMENDED]

■ 3. The authority citation for part 81 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 4. In § 81.318, the table entitled "Kentucky—$PM_{2.5}$ (Annual NAAQS)" is amended under "Cincinnati-Hamilton, OH-KY-IN" by revising the entries for "Boone County," "Campbell County," and "Kenton County" to read as follows:

§ 81.318　Kentucky.
\* \* \* \* \*

KENTUCKY—$PM_{2.5}$
[Annual NAAQS]

| Designated area | Designation [a] | |
|---|---|---|
| | Date [1] | Type |
| Cincinnati-Hamilton, OH-KY-IN: | | |
| Boone County | This action is effective December 15, 2011 | Attainment. |
| Campbell County | This action is effective December 15, 2011 | Attainment. |
| Kenton County | This action is effective December 15, 2011 | Attainment. |
| \* | \* | \* |

[a] Includes Indian Country located in each county or area, except as otherwise specified.
[1] This date is 90 days after January 5, 2005, unless otherwise noted.

\* \* \* \* \*
[FR Doc. 2011–32058 Filed 12–14–11; 8:45 am]
**BILLING CODE 6560–50–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 82**

[EPA–HQ–OAR–2010–0672; FRL–9507–6]

**RIN 2060–AQ39**

**Protection of Stratospheric Ozone: Extension of the Laboratory and Analytical Use Exemption for Essential Class I Ozone-Depleting Substances**

**AGENCY:** Environmental Protection Agency (EPA).
**ACTION:** Final rule.

**SUMMARY:** EPA is extending the laboratory and analytical use exemption for the production and import of Class I ozone-depleting substances through December 31, 2014. This action is taken under the Clean Air Act consistent with the recent actions by the Parties to the *Montreal Protocol on Substances that Deplete the Ozone Layer*. The exemption allows the production and import of controlled substances in the United States for laboratory and analytical uses that have not been already identified by EPA as nonessential.

**DATES:** This action is effective on December 15, 2011.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2010–0672. All documents in the docket are listed on the *www.regulations.gov* Web site. Although listed in the index, some information is not publicly available, *e.g.*, CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *http://www.regulations.gov* or in hard copy at the Air and Radiation Docket, EPA/DC, EPA West, Room 3334, 1301 Constitution Ave. NW., Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the Air and Radiation Docket is (202) 566–1742).

**FOR FURTHER INFORMATION CONTACT:** Jeremy Arling by regular mail: U.S. Environmental Protection Agency, Stratospheric Protection Division (6205J), 1200 Pennsylvania Avenue NW., Washington, DC 20460; by courier service or overnight express: 1301 L Street NW., Washington, DC 20005; by *telephone:* (202) 343–9055; or by *email: arling.jeremy@epa.gov*. You may also visit the EPA's Ozone Protection Web site at *http://www.epa.gov/ozone/strathome.html* for further information about EPA's Stratospheric Ozone Protection regulations, the science of ozone layer depletion, and other related topics.

**SUPPLEMENTARY INFORMATION:** Section 553(d) of the Administrative Procedure Act (APA), 5 U.S.C. Chapter 5, generally